IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **STEVEN HESSE**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | Civil No. **09-496-CJP**[1] |
| | ) | |
| **COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

**PROUD, Magistrate Judge:**

Pursuant to 42 U.S.C. § 405(g), plaintiff Steven Hesse, represented by counsel, is before the Court seeking review of the final decision of the Social Security Administration denying him Supplemental Security Income (SSI) pursuant to 42 U.S.C. § 1382, Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423, or even a Period of Disability (POD) pursuant to 42 U.S.C. § 416(i). (Doc. 2.) In addition to submitting the administrative record (Doc. 14), plaintiff and defendant have fully briefed their positions. (Docs. 18 and 26.)

Plaintiff Hesse's physical ailments are not in dispute, *per se*. Rather, this appeal centers around the sufficiency of the evidence and legal analysis by Administrative Law Judge ("ALJ") Sally C. Reason. Plaintiff claims ALJ Reason's finding that plaintiff is not disabled is not supported by substantial evidence. More specifically, plaintiff argues:

---

[1]In accordance with 28 U.S.C. § 636(c), the parties consented to have all proceedings, including entry of judgment, conducted by a Magistrate Judge. (Docs. 16 and 17.) Consequently, U.S. District Judge J. Phil Gilbert referred this action to the undersigned Magistrate Judge. (Doc. 20.)

1.      The ALJ improperly assessed plaintiff's credibility; and

2.      The ALJ did not afford proper weight to the opinion of plaintiff's treating physicians, Dr. Davidson, and Dr. Ballesteros.

(Doc. 18.)

## Brief Summary of the Evidence and Procedural History

Plaintiff applied for SSI and DIB on August 31, 2005, alleging the onset of disability as of March 1, 2002,  after a post-laminectomy bad back became excessively painful.  (Doc. 14-5, pp. 2-4 and 8-10; Doc. 14-2, p. 28; and Doc. 14-2, p. 29.)  At the time of alleged onset, plaintiff was 46 years old; he was 49 years old at the time of decision.  (*See* Doc. 14-2, p. 23.)  Plaintiff has a 10th grade education (or less), and he was last employed as an iron worker.  (Doc. 14-2, pp. 29 and 41.)  From a vocational perspective, that work is heavy, as performed.  (Doc. 14-2, pp. 42-43.)

Plaintiff does not take issue with ALJ Reason's factual recitation, per se.  Rather, plaintiff disagrees with the ALJ's focus on and interpretation of certain evidence, leading to the conclusion that plaintiff is not credible.  (*See* Doc. 18, pp. 2-6.)  Therefore, only an outline of plaintiff's most relevant medical history will be included in this order; the Court will generally adopt the ALJ's factual recitation (Doc. 14-2, pp. 17-21), and cite to specific evidence as necessary for a more detailed analysis of plaintiff's arguments.

In brief, in 1994, plaintiff had a broken arm surgically repaired with steel rods; he subsequently returned to work.  (Doc. 14-7, p. 73.)  1998, plaintiff had a laminectomy at L4-5 and L5-S1; he returned to work three months after the operation.  (Doc14-7, pp. 47 and 59.)  In March 2002, plaintiff began experiencing back pain again, which radiated down his left leg.

(Doc. 14-7, p. 47.)  Plaintiff has not worked since March 2002, the alleged onset date.

In March 2002, imaging studies revealed a pseudomeningocele or cystic-like structure on the lumbar spine.  (Doc. 14-7, pp. 50-62.)  At that time, plaintiff described his untreated pain as 8 on a 10-scale.  (Doc, 14-7, p. 62.)  Nerve root block injections initially helped relieve plaintiff's pain, down to a 3 on a 10-scale, but that relief was short-lasting.  (Doc. 14-7, pp. 62 and 89.)  In mid-May 2002, plaintiff underwent surgery to decompress the nerve roots and close the pseudomeningocele, which relieved the pain, but plaintiff continued to experience headaches, which were relieved by Tylenol with codeine.  (Doc. 14-7, pp. 35 and 87.)  In September 2002, plaintiff was released to work, but restricted to no bending from the waist, and no lifting more than 25-30 pounds.  (Doc. 14-7, p. 35.)  An October 2002 MRI showed reestablishment of the pseudomeningocele, but the cyst was characterized as "essentially asymptomatic;" radicular pain had ceased, preoperative discomfort and the neurological deficit had cleared.  (Doc. 14-7, p. 94.)

An independent medical examination performed by Dr. John A. Gragnani, M.D., in October 2002, indicates plaintiff described his pain as 6-7 on a 10-scale, with periods where pain reached the level of 10.  (Doc. 14-7, p. 31.)  The doctor opined that plaintiff's physical limitations stemmed from the 1998 surgery, and subsequent surgery to attempt to repair a dura tear, all of which resulted in a current pseudo cyst.  (Doc. 14-7, p. 32.)  Apparent depression was also noted.  (Doc. 14-7, p. 32.)  The doctor noted the aforementioned work restrictions, but did not note any other substantial physical deficit.

In February 2003, plaintiff had another surgery on his back.  (Doc. 14-7, p. 22 (medical records of this operation are not in the record, but the surgery is otherwise noted in Dr. Davidson's records).)

In October 2005, Dr. Adrian Feinerman, M.D., performed a 30-minute consultative exam and record review.  (Doc. 14-7, pp. 121-125.)  According to Dr. Feinerman's report, plaintiff claimed he could walk 3/4 of a mile, stand for 30 minutes, sit for an hour, lift approximately 25 pounds, squat and bend, albeit with some back pain.  The doctor's examination revealed no limitations of motion in the spine, normal ambulation, the ability to sit, walk, stand, squat and bend without difficulty, a full range of motion in all weight bearing joints; and strength and neurological tests were normal.

In November 2005, Dr. Paul Smalley issued a residual functional capacity assessment, indicating plaintiff was capable of lifting and carrying 50 pounds occasionally and 25 pounds frequently, sitting, standing and walking for six hours during an eight hour day; and no limitations were perceived.  (Doc. 14-7, pp. 109-116.)

In December 2005, Dr. Robert J. Davidson, M.D., plaintiff's treating physician, completed a source statement regarding both plaintiff's mental and physical condition.  From a physical standpoint, Dr. Davidson opined that plaintiff was capable of lifting and carrying no more than 10 pounds occasionally due to herniated discs and post-operative complications, lower spine defects and sciatica; plaintiff could stand for one hour during an eight hour work day due to low back pain and a need to lie down; and plaintiff could sit for two to three hours (45 minutes at a time), needing to shift position and take breaks; furthermore, plaintiff was completely restricted from climbing, balancing, stooping, crouching, kneeling and crawling due to his medication and the affects on his equilibrium and coordination; and due to the affects of medication, plaintiff was to avoid heights, moving machinery, temperature extremes, chemicals, dust, noises, fumes, humidity and vibration.  (Doc. 14-8, pp. 30-32.)  Dr. Davidson characterized

plaintiff's pain as being severe and constant– plaintiff is never out of pain.  (Doc. 14-8, p. 32.)

Dr. Davidson opined that, with regard to plaintiff's mental status, plaintiff had a fair ability to make occupational adjustments, although medication affects his cognitive ability, he has poor memory and concentration, and he gets short tempered and frustrated; in terms of performance adjustments, plaintiff had poor or no ability to understand, remember and carry out complex job instructions, and a fair ability relative to non-complex instructions; and plaintiff was judged as poorly relating in social situations, unable to maintain emotional stability in a work place, but still able to perform the activities of daily living, including managing his finances. (Doc. 14-8, pp. 26-28.)

Plaintiff continued to regularly see Dr. Davidson through mid-2008, after the close of the evidentiary record.  Plaintiff also visited the emergency room on at least 18 occasions between 2002 and 2007 seeking medication for pain, generally when his medication was insufficient for pain control, or when medication was stolen or had run out prior to his next appointment with Dr. Davidson.  (Doc. 14-7, pp. 24, 25, 27, 28, 34, 36, 100, 101-102, 103, 104, 105, 107, 108 and; Doc. 14-8, pp. 56, 61, 66, 70, 74, 79.)

In January 2006, Dr. M. Ballesteros, Ph.D., examined plaintiff and issued a mental status evaluation.  (Doc. 14-7, pp. 126-130.)  Dr. Ballesteros noted that plaintiff had initially denied alcohol use, but later "inadvertently reported" that he had been involved in three alcohol related car accidents, including one where his wife's 10 year old son was injured, causing plaintiff to quit drinking.  (Doc. 14-7, p. 128.)  Plaintiff reported depression and suicidal thoughts.  (Doc. 14-7, p. 128.)  Dr. Ballesteros indicated plaintiff had a GAF score within the range of 61-70 (within the past year).  (Doc. 14-7, p. 130.)  Dr. Ballesteros concluded that plaintiff had

situational depression and anxiety, a possible personality disorder, chronic pain and psychological stressors.   (Doc. 14-7, p. 129.)

In February 2006, an Agency psychologist reviewed the record of plaintiff's reported activities, and concluded plaintiff had situational depression and anxiety, and a possible personality disorder, which resulted in no greater than mild functional restrictions relative to the activities of daily living and maintaining concentration, persistence and pace.  (Doc. 14-8, pp. 2-15.)

Dr. Davidson's 2008 medical source statement regarding plaintiff's physical condition limited plaintiff to lifting and carrying no more than 10 pounds; he was deemed capable of standing, walking or sitting for three hours during an eight hour work day (one hour at a time without interruption, with feet elevated and opportunities to lie down); no postural activities were permitted due to back instability and the affects of medication; reaching, handling, feeling and the ability to push and pull were all affected; and a full range of environmental restrictions were imposed, as in 2005.  (Doc. 14-8, pp. 88-90.)  The doctor also cited plaintiff's historical arm injury as a factor for the aforementioned restrictions.  (Doc. 14-8, p. 90.)

In July 2008, an evidentiary hearing was conducted before ALJ Reason.  (Doc. 14-2, pp. 29-52.)  According to plaintiff, he stopped working due to pain associated with his 1998 laminectomy, and subsequent surgery and treatment has left his back in a fragile state.  (Doc. 14-2, pp. 29-32.)  Plaintiff reported taking as many as 360 pills per month, until he told his doctor that he "wanted to keep his liver."  (Doc. 14-2, p. 31.)  At the time of the hearing, plaintiff was taking morphine sulfate, which relieves 98% of his pain, depending on how active plaintiff is. (Doc. 14-2, pp. 31-32.)  Plaintiff explained that he cannot return to work because there is a

chance he could make his back condition worse with even minimal exertion.  (Doc. 14-2, p. 32.)

Plaintiff also reported right arm pain and difficulty with knobs and the like– lingering affects

from a 1992 accident and surgical repair.  (Doc. 14-2, pp. 40-41.)    When plaintiff does a lot of

bending he gets spinal headaches, which require Demerol.  (Doc. 14-2, p. 32.)  Plaintiff is also

taking a muscle relaxer for leg cramps, and Xanax for his anxiety.  (Doc. 14-2, p. 34.)  Only the

Demerol caused side effects, making him "loopy."   (Doc. 14-2, p. 34.)  Plaintiff also described

having trouble sleeping, due to pain and anxiety.  (Doc. 14-2, p. 34.)

Plaintiff testified that he is able to make the bed, sweep the floors and do the dishes.

(Doc. 14-2, p. 33.)  But, he has to rest during the day and elevate his feet three to six times per

day, depending on his degree of activity.  (Doc. 14-2, pp. 35-36.)  Plaintiff stated that he can

drive a car for only one hour without medication, but for three to five hours with medication.

(Doc. 14-2, pp. 34-35.)  Plaintiff estimated that he was capable of sitting, standing and walking

for up to one hour each, and then he would rest for 20-30 minutes.  (Doc. 14-2, pp. 36 and 38.)

Plaintiff described being able to bend, but not bend and lift simultaneously; he did not want to

risk lifting more than 10 pounds.  (Doc. 14-2, p. 36.)  Plaintiff also stated that pushing and

pulling aggravates his back.  (Doc. 14-2, p. 36.)  According to plaintiff, he can no longer do yard

work or grocery shopping, and he cannot fish because he cannot tolerate the rocking motion of

the boat.  (Doc. 14-2, p. 39.)  Plaintiff also described getting irritable due to his pain, and

avoiding crowds in an effort to guard his back.  (Doc. 14-2, p. 39.)

Vocational expert Dr. Jen Hagan testified that plaintiff's prior work was "heavy," as

described.  (Doc. 14-2, pp. 42-43.)  The ALJ presented Dr. Hagan with a hypothetical based on a

person of plaintiff's age, with the same education and work history, who was capable of light

7

work, albeit with no crouching or crawling, who could only climb stairs occasionally, who could not utilize ladders, had only a very limited ability to stoop, and who could only squat occasionally.  (Doc. 14-2, pp. 42-43.)  Dr. Hagan opined that such a person could not perform plaintiff's past work, but could perform light, unskilled jobs, such as ticket seller, fast food worker, or sales attendant– all jobs available in Illinois by the thousands.  (Doc. 14-2, pp. 44-45.)

## ALJ Reason's Decision

ALJ Reason issued her opinion on August 11, 2008.  (Doc. 14-2, pp. 15-25.)  As a preliminary matter, the ALJ found that plaintiff only had insured status through December 31, 2006.  Plaintiff's lumbosacral spinal condition was deemed to be a "severe" impairment, but not presumptively disabling under the regulations.  The ALJ acknowledged that plaintiff's impairments could reasonably cause the basic symptoms alleged, including pain.  However, the ALJ did not find that the cumulative evidence supported the claimed persistence or intensity of symptoms, or the preclusive affect on sustained employment.  Plaintiff's depression and anxiety, and his headaches were all generally accepted by the ALJ.

Plaintiff was found to have the residual functional capacity to lift and carry 10 pounds frequently and 20 pounds occasionally; and to sit, stand and walk for six hours out of an eight hour work day, which would permit "light " work[2].  (20 C.F.R. §§ 404.1567 and 416.967.)

_____

[2]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." **20 C.F.R. §§ 404.1567(b); 416.967(b).**

8

However, crawling and climbing ladders was precluded; only occasional climbing of stairs, stooping and squatting was permitted; and no forceful pushing or pulling with the upper extremities was permitted.  In accordance with the Medical-Vocational Rules (20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 202.18) and Dr. Hagan's testimony regarding what jobs would be available to a person with the aforementioned residual functional capacity, plaintiff was found to be "not disabled" at any point during the relevant time period.

The ALJ's written opinion states: "In generally commenting on the claimant's credibility, the ALJ first notes some major inconsistencies in his statements."  (Doc. 14-2, p. 17.)  The ALJ then highlighted inconsistencies regarding whether plaintiff last worked in 2001 or March 2002; whether plaintiff had a 12th grade education, or had only started the 10th grade, or had actually completed 10th grade; the scope of plaintiff's activities, e.g. conflicting statements regarding yard work, and indications plaintiff engaged in motorcycle riding, welding and helping someone move; plaintiff's history of alcohol use; and possible drug seeking behavior.  The ALJ stated: "These inconsistencies in matters of basic social history reflect adversely on the claimant's overall credibility, including as relates to the persistence and intensity of his symptoms."  (Doc. 14-2, p. 17.)  The ALJ also stated: "There also appears to be a history of pain medication seeking behavior and, in fact, a diagnosis of drug seeking behavior."  (Doc. 4-2, p. 18 (citation to evidence omitted.)  The ALJ referenced many instances where plaintiff sought medication refills, claiming to have run out, and "denials by physicians" and "specific comment that casts doubt on the veracity of the claimant's pain complaints."  (Doc. 14-2, p. 18.)  The ALJ then stated: "The medical documents and history must be analyzed with awareness of the factors discussed above."  (Doc. 14-2, p. 19 (listing six factors undermining plaintiff's credibility).)

The ALJ observed that plaintiff was released to work in October 2002, albeit with the restriction that he not lift more than 20 pounds, and not bend at the waist.  The ALJ acknowledged plaintiff's February 2003 surgery, but then noted that plaintiff's surgeon released him from his care in mid-2004.  Dr. Davidson's 2005 assessment was rejected based on plaintiff's own statements about his abilities and activities, and because the ALJ did not find that the doctor's records contained adequate support for his conclusions.  Instead, the ALJ elected to rely on Dr. Feinerman's 2005 consultative report.  The ALJ thought Dr. Feinerman offered the greatest objective details since plaintiff's operations; and, "the entries of Dr. Davidson that are subsequent to Dr. Feinerman's report primarily relate subjective complaints, medications and requests for medications."  (Doc. 14-2, pp. 20-21.)

The ALJ also concluded that the nexus between plaintiff's depression and pain was "suspect," in light of plaintiff's "exaggerations," and because plaintiff had not been under the care of a mental health specialist.  (Doc. 14-2, p. 22.)  The ALJ noted that Dr. Ballesteros had diagnosed *situational* depression and anxiety, and a *possible* personality disorder, without confirming data.  The ALJ otherwise favored Dr. Ballesteros's evaluation over Dr. Davidson's, becasue Dr. Davidson is not a mental health professional and there were no supporting notations in Dr. Davidson's treatment records.   The ALJ concluded plaintiff's depression and anxiety resulted in no more than mild restrictions relative to daily activities of living and plaintiff's ability to maintain social functioning, as well as persistence and pace.

Although plaintiff was found incapable of returning to his past work, he was deemed capable of "light" work (with certain restrictions); as a younger individual with a "limited or less" education and no transferrable skills, plaintiff was found not disabled, in accordance with

Rule 202.18 and Dr. Hagan's vocational testimony.

## <u>The Standard of Review</u>

To be entitled to disability insurance benefits the claimant must establish that he is "disabled" under the Social Security Act. A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. In essence, it must be determined (1) whether the claimant is presently employed; (2) whether the claimant has an impairment or combination of impairments that is severe; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. *See Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992); *see also* 20 C.F.R. §§ 404.1520 and 416.920.

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, the Court must determine not whether plaintiff is in fact disabled, but whether the ALJ's findings were supported by substantial evidence; and, of course, whether any errors of law were made. *See Books v. Chater*, 91 F.3d 972, 977-978 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir.1995)). The Supreme Court has defined substantial evidence as "such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence" the entire administrative record is taken into consideration, but this Court *does not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). Furthermore, an ALJ may not disregard evidence when there is no contradictory evidence. *Sample v. Shalala*, 999 F.2d 1138, 1143 (7th Cir. 1993).

A negative answer at any point in the five step analytical process, other than at the third step, stops the inquiry and leads to a determination that the claimant is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984). If a claimant has satisfied steps one and two, he or she will automatically be found disabled if he or she suffers from a listed impairment (step three). If the claimant does not have a listed impairment but cannot perform his or her past work, the burden shifts to the Commissioner at step four to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984); *see also Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004) (the burden of proof remains with the claimant through the fourth step).

Although the standard of review applied by this reviewing court requires the ALJ's decision to be supported by substantial evidence, an ALJ utilizes a preponderance of the evidence standard, the default standard in civil and administrative proceedings. *Jones ex rel. Jones v. Chater*, 101 F.3d 509, 512 (7th Cir. 1996).

**Analysis**

12

## 1.  Plaintiff's Credibility

Plaintiff takes issue with ALJ Reason's statement: "In generally commenting on the claimant's credibility, the ALJ first notes some major inconsistencies in his statements" (Doc. 14-2, p. 17).  Plaintiff argues that the inconsistencies noted were not "major," and they were not dispositive to the disability claim.  From plaintiff's perspective, the ALJ's overemphasis on inconsistencies about education and the date plaintiff stopped working tainted the ALJ's analysis of the disability question.  Similarly, plaintiff takes issue with "impeachment" evidence cited by the ALJ, such as notes from unknown authors offering assessments and facts about plaintiff's activities, alcohol use and supposed drug-seeking behavior.  Plaintiff argues that the evidence– including the fact that doctors continued to dispense medication– is consistent with plaintiff's surgical history and allegations of pain.

Social Security Rule 96-7p requires an ALJ to specifically articulate the rationale for any credibility determination relative to the consideration of pain and its functional effects.  *Brindisi v. Barnhart*, 315 F.3d 783 (7th Cir. 2003).

> The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." ... The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

*Brindisi*, 315 F.3d at 787 (quoting from SSR 96-7p).  With that said, the Court must reiterate the relatively narrow parameters of review.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  42 U.S.C. § 405(g).

Thus, the Court must determine not whether plaintiff is in fact disabled, but whether the ALJ's findings were supported by substantial evidence; and, of course, whether any errors of law were made.  *See Books v. Chater*, 91 F.3d 972, 977-978 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir.1995)).  The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  In reviewing for "substantial evidence" the entire administrative record is taken into consideration, but this Court *does not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).

Although this Court might not have chosen to characterize discrepancies regarding plaintiff's education and when he stopped working as "major," plaintiff overemphasizes those points and underemphasizes the discrepancies that are clearly relevant and even dispositive. Plaintiff also ignores the cumulative effect of discrepancies between plaintiff's testimony regarding his activities and abilities and other evidence.  The ALJ's analysis was not improperly tainted; rather, the ALJ merely recognized many discrepancies in the record– evidence that supports the conclusion that plaintiff's testimony was not fully credible.  Plaintiff's attempt to attack the evidentiary foundation for consideration of various medical notes and commentary, and phone message slips reflecting the opinions of the person conveying the message and what is obviously the doctor's written response, ignores the fact that the Federal Rules of Evidence do not apply in Social Security disability hearings.  42 U.S.C. § 405(b)(1).  Moreover, plaintiff did not previously object to the record evidence, which all appears to be records kept in the ordinary course of business.

14

Plaintiff testified that right arm pain affected his ability to work knobs and the like, but plaintiff worked for years after his 1994 arm surgery, and medical records do not reflect that plaintiff was actively seeking treatment for, or complaining about his right arm.  In September and October of 2002, plaintiff was released to work (with minor restrictions), and an MRI report reflected that plaintiff was "essentially asymptomatic," radicular pain had stopped, and preoperative discomfort and neurological deficits had cleared.  Yet, at that same time plaintiff reported to Dr. Gragnani (during the course of an independent medical examination) that his pain was 6-7 on a 10-scale, with periods where his pain reached 10.  Similarly, on his Activities of Daily Living Questionnaire from that time period plaintiff indicated that he had a high degree of pain and limitation.  The fact that plaintiff's treating physician released plaintiff to work, while plaintiff reported great limitation to those who were evaluating him for benefits, throws plaintiff's credibility into doubt.

Plaintiff testified that he was capable of driving a car for 3-5 hours, but he could only sit for up to one hour.  There are recorded notations indicating plaintiff was riding his motorcycle and doing yard work on *multiple* occasions, and that plaintiff had indicated he had burned his eyes welding.  The record is swollen with notations about plaintiff requesting or seeking more pain medication.  Emergency Room doctors often dispensed only a very limited amount of medication with the understanding that plaintiff was to see his treating physician.  In March 2007, an Emergency Room record indicates that plaintiff was "diagnosed" with "drug seeking behavior"  Even plaintiff's treating physician eventually denied plaintiff's premature requests for pain medication.  Plaintiff was taking more than the prescribed dosage of medication; his doctor even cautioned him about how many pills he was to take, yet plaintiff sought out additional

15

medication from other sources and his testimony intimated that he had objected about how much medication had been prescribed by his physician.  The record contains overwhelming evidence in support of the conclusion that plaintiff is not credible with respect to his physical abilities, impairments and pain.  Therefore, this Court finds no error relative to the ALJ's finding that plaintiff was not fully credible.

### 2.  The Opinions of Dr. Davidson and Dr. Ballesteros

Citing  ALJ Reason's statement that "Dr. Feinerman's October 2005 consultative report relates the greatest objective detail on examination since the operative procedures," plaintiff argues that the ALJ (improperly) gave more weight to Dr. Feinerman's opinion than was given to the opinions of Dr. Davidson and Dr. Ballesteros.  In a nutshell:  Dr. Feinerman's opinion reflected that plaintiff was physically capable of meeting the requirements of "light work;"  Dr. Davidson's opinion would have clearly precluded plaintiff from even "sedentary" work and also indicated that he was too emotionally unstable for work; and Dr. Ballesteros opined that plaintiff suffered from situational depression and anxiety, as well as a possible personality disorder, and he had a GAF score of 61-70, which denotes some "mild" symptoms or "some difficulty" in social or occupational functioning, but the individual is "generally functioning pretty well."  ***See*, Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV), pp. 32-34.**  Plaintiff stresses that Dr. Davidson treated plaintiff from 2002-2008, and Dr. Feinerman saw plaintiff for 30 minutes on a consultative basis.  Plaintiff further argues that, although Dr. Ballesteros only saw plaintiff for approximately 30 minutes on a consultative bases, Dr. Ballesteros was the only mental health specialist to evaluate plaintiff.

16

Residual functional capacity is an *administrative assessment* of what work-related activities a claimant can perform despite his or her limitations. *See* 20 C.F.R. §§ 404.1545(a) and 416.945(a); and *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). "In assessing the claimant's [residual functional capacity], the ALJ must consider both the medical and nonmedical evidence in the record." *Id.* A treating source's opinion will generally be given controlling weight when that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record. . . ." 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2); *Simila v. Astrue*, 573 F.3d 503, 514 (7th Cir. 2009). However, in accordance with Sections 404.1527(f)(2) and 416.927(f)(2), state agency physicians are deemed experts in Social Security disability evaluation, and an ALJ may rely on their opinions, provided the usual evidentiary support is present and the ALJ explains the weight given to the agency physician's opinion.

The law does not *require* an ALJ to accord a treating physician's opinion more weight than a consulting physician's opinion. *Simila v. Astrue*, 573 F.3d 503, 514 (7th Cir. 2009)*; White v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2005); *Micus v. Bowen*, 979 F.2d 602, 608 (7th Cir. 1992). In either situation, an ALJ weighs conflicting evidence from medical experts, and a reviewing court may not re-weigh the evidence. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). However, "[a]n administrative law judge can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).

Plaintiff correctly observes that Dr. Davidson treated plaintiff for a long period of time,

17

particularly in comparison to the brief consultative examination by Dr. Feinerman.  Plaintiff also correctly observes that Dr. Davidson's 2008 medical source statement offered a rationale for the prescribed limitations.  Plaintiff contends that Dr. Feinerman's report does not explain why Dr. Feinerman diverged from the record evidence in his evaluation.  The ALJ concluded that Dr. Feinerman's opinion was supported by more objective data, and Dr. Davidson's opinion was contradicted by his own records and plaintiff's acknowledged greater capacities.

Dr. Feinerman did only review a limited number of medical records, from two emergency room visits in 2004, but he also had plaintiff's history of injuries and surgeries, and his present medications.  More important, Dr. Feinerman examined plaintiff and relied upon plaintiff's own contemporaneous statements.  Plaintiff does not address the fact that he reported to Dr. Feinerman that he could walk 3/4 of a mile, stand for 30 minutes, sit for an hour and lift about 25 pounds.  The doctor's physical examination revealed full range of motion in plaintiff's spine, and no other difficulties were observed.  Dr. Feinerman's opinion is consistent with his observations and plaintiff's statements.

In rejecting Dr. Davidson's opinion, the ALJ primarily relied on the contrast between Dr. Davidson's opinion and plaintiff's own statements.  The ALJ also observed that Dr. Davidson's records generally reflected plaintiff's subjective complaints, and his requests for medications, and that there was very little objective evidence.  After reviewing the entire record, the Court was similarly taken by a glaring lack of objective observations and/or tests in Dr. Davidson's treatment notes, and the disproportionate number of notations regarding plaintiff's requests for additional medication.  The ALJ was clearly justified in discounting Dr. Davidson's opinion, and instead basing his residual functional capacity assessment on Dr. Feinerman's report and

plaintiff's own statements.

With respect to plaintiff's mental status, the ALJ rejected Dr. Davidson's opinion that plaintiff was mentally and emotionally unsuited for work.  The ALJ commented that Dr. Ballesteros's evaluation was unimpressive in terms of detailed data.  Nevertheless, the ALJ essentially accepted Dr. Ballesteros's diagnosis of depression and anxiety, but the diagnosis of "possible personality disorder" was rejected as not confirmed by other data.   The ALJ also observed that plaintiff was not under the care of a mental health specialist.  Dr. Feinerman's limited observations about plaintiff's mental presentation were noted by the ALJ, too, but <u>not</u> given controlling weight as plaintiff suggests.  Relative to Dr. Ballesteros's report and the portion of Dr. Feinerman's report pertaining to mental status, the ALJ specifically stated that she found "the composite of the aforementioned data far more probative than Dr. Davidson's responses on mental health assessment .. . ."  (Doc. 14-2, p. 22.)

There is some evidence to support the ALJ's finding that plaintiff suffers from depression and anxiety, just as Dr. Ballesteros had opined.  However, even Dr. Ballesteros's evaluation indicates that plaintiff has a GAF of 61-70, which reflects only "mild" symptoms or "some difficulty" in social or occupational functioning, but that the individual is "generally functioning pretty well."   The ALJ correctly dismissed Dr. Ballesteros's diagnosis of "*possible* personality disorder," as not being substantiated.  Although Dr. Ballesteros considered plaintiff to have decreased numerical reasoning ability, he also considered plaintiff capable of handling his own finances.  In terms of the affects of pain and medication, the ALJ correctly observed that there is a paucity of historical evidence of any such affects, and plaintiff stated that medication controlled 98% of his pain and only Demerol caused side effects, which he only used if he did a

19

lot of bending and had a headache.  Therefore, it was not error for ALJ Reason to not adopt or give substantial weight to Dr. Ballesteros's report.  Again, the ALJ is not bound to accept Dr. Ballesteros's report just because he was the only mental health specialist to offer an opinion, at least not in a situation such as this, where all aspects of the opinion were not consistent with substantial record evidence and the ALJ adequately explained her rationale.  Therefore, the Court finds no error in the ALJ's analysis and conclusions relative to plaintiff's mental health status and residual functional capacity.

### Conclusion

Steps 1-4 of the five step analytical framework are not disputed; plaintiff's two arguments both pertained to step 5, regarding whether plaintiff is capable of performing any work within the economy.  There is no dispute that plaintiff cannot perform his past work, which was heavy, unskilled labor.  Rather, the key dispute is over whether plaintiff has the residual functional capacity for "light" work with limited restrictions, as ALJ Reason concluded.  Had the Court found that the ALJ erred or that there was not substantial evidence to support the ALJ's findings regarding plaintiff's credibility and the weight afforded to Dr. Davidson and Dr. Ballesteros's opinions, the residual functional capacity issue would have been undermined. However, absent one or both of those errors, the ALJ's finding that plaintiff is capable of "light" work stands.  Plaintiff does not argue that there was any error relative to the vocational expert's opinion and the ALJ's ultimate conclusion of disability.  Therefore, no further analysis is required, and the decision to deny plaintiff's applications in all respects will be upheld.

**IT IS THEREFORE ORDERED** that, for the aforestated reasons, the decision of the Commissioner of Social Security to deny plaintiff Steven Hesse Supplemental Security Income

pursuant to 42 U.S.C. § 1382, Disability Insurance Benefits pursuant to 42 U.S.C. § 423, or even a Period of Disability pursuant to 42 U.S.C. § 416(i) is **AFFIRMED** in all respects.  Judgment shall enter accordingly.

**IT IS SO ORDERED.**
**DATED: September 29, 2010**

**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**U. S. MAGISTRATE JUDGE**

21